**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WANDA LEE SHAVER,
<u>Plaintiff-Appellant,</u>

v.

No. 97-1954

DIXIE TRUCKING COMPANY,
INCORPORATED,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-96-172-3-P)

Argued: October 30, 1998

Decided: May 21, 1999

Before WILLIAMS and MOTZ, Circuit Judges, and
STAMP, Chief United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Louis L. Lesesne, Jr., LESESNE & CONNETTE, Char-
lotte, North Carolina, for Appellant. William Porter Farthing, Jr.,
PARKER, POE, ADAMS & BERNSTEIN, Charlotte, North Caro-
lina, for Appellee. **ON BRIEF:** Keith M. Weddington, PARKER,
POE, ADAMS & BERNSTEIN, Charlotte, North Carolina, for
Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Wanda Lee Shaver appeals the district court's grant of summary judgment in favor of Dixie Trucking Company, Incorporated on a sexual harassment claim brought under Title VII of the Civil Rights Act of 1964. Finding no error, we affirm.

I.

Dixie Trucking Company, Incorporated ("Dixie") hired Wanda Lee Shaver ("Shaver") in April 1995 as a rate clerk at its facility in Charlotte, North Carolina. Charles Finley ("Finley"), Dixie's Vice-President of Traffic, served as one of Shaver's supervisors. Shaver's shift began at 5:00 p.m., which was about an hour or two before Finley's workday ended. On a typical day, Shaver and Finley would not work the same hours. Every week or two, however, at the beginning of Shaver's shift, Finley would call her into his office to discuss business.

Several alleged incidents of sexual harassment underlie Shaver's complaint. The first instance was when Finley placed his hand on Shaver's knee during her job interview with Dixie. (J.A. at 59). Also, Finley rubbed Shaver's back and shoulders or put his arm around her several times during her employment. (J.A. at 81, 86).

In July 1995, on two separate occasions, Finley called Shaver into his office for a stated business purpose but when Shaver moved to leave the office Finley grabbed and hugged her. [1] After the first "hug,"

_____

[1] Shaver admits that prior to Finley's "hugs," she had hugged his neck. (J.A. at 69, 75). She also had hugged at least one other male co-worker's neck. (J.A. at 69, 76). In fact, Shaver described herself as "a person [who] hugs people's necks," if she knows them. (J.A. at 75).

2

Shaver asked Finley not to do it again. (J.A. at 69). According to Shaver, Finley had hugged her "too tightly" and it made her feel uncomfortable. (J.A. at 69-70). After that first incident, Shaver believed that she would not have any further "problems." (J.A. at 76). The second "hug" frightened Shaver and was much stronger than she would hug "just about anybody." (J.A. at 71). In fact, Shaver felt as though her "breast was going through his backbone." (J.A. at 71). She had to push Finley away in order to leave his office. (J.A. at 83).

The two hugging incidents were approximately two to three weeks apart and neither lasted longer than five to ten seconds. (J.A. at 71, 82-83). At neither time, apparently, did Finley make any sexually suggestive remarks or touch or attempt to touch Shaver in any other manner. Shaver states that after the second hugging incident, she suffered panic attacks, nightmares, and loss of sleep. She also claims that the incident triggered a memory of having been kidnapped and raped twenty-three years earlier.

Shaver did not immediately report her experiences with Finley to anybody at Dixie, but she mentioned them in August 1995 during an investigation that Dixie conducted following a complaint filed against Finley by another female employee. When Dixie initiated the investigation, it placed Finley on a leave of absence from which he never returned. Shaver resigned from Dixie on October 24, 1995 allegedly due to stress she suffered as a result of her encounters with Finley.

Shaver then filed this action alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and making claims under North Carolina law for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent hiring and retention. Shaver also alleged a claim for a violation of North Carolina General Statute§ 143-422.2 (North Carolina's Equal Employment Practices Act). The district court granted summary judgment in favor of Dixie on several grounds, including that there was no basis for imputing liability to Dixie on the sexual harassment claim.

II.

The district court's grant of summary judgment is reviewed de novo. Causey v. Balog, 162 F.3d 795, 800 (4th Cir. 1998). Summary

3

judgment is appropriate if the evidence, when viewed in the light most favorable to the non-movant, indicates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. See id.

Most of the arguments briefed by the parties on appeal address the agency principles that would determine Dixie's liability for Finley's alleged harassing conduct.[2] This Court finds that summary judgment should be granted in favor of Dixie, but it reaches that result without addressing the issue of vicarious liability.

In Meritor Sav. Bank, FSB v. Vinson, the Supreme Court held that a plaintiff may establish a violation of Title VII "by proving that discrimination based on sex created a hostile or abusive work environment."[3] 477 U.S. 57, 66 (1986). Such actionable sexual harassment must be so "severe or pervasive" that it "`alter[s] the conditions of [the victim's] employment and creates an abusive working environment.'" Id. at 67 (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). Further, such an environment must be objectively hostile or abusive, i.e., "an environment that a reasonable person would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). This determination may be made by looking at all the circumstances surrounding the alleged hostile environment, including the frequency and severity of the harassing conduct, whether the conduct is physically threatening or humiliating, and whether it interferes unreasonably with an employee's work performance. Id. at 23.

_____

**2** On September 30, 1998, this Court ordered the parties to submit supplemental briefs addressing the significance of the Supreme Court's recent decisions in Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998) (holding that an employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successfully higher) authority over the employee), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998) (same).

**3** Title VII of the Civil Rights of 1964 provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

4

"Title VII does not provide a remedy for every instance of verbal or physical harassment in the workplace." <u>Lissau v. Southern Food Serv., Inc.</u>, 159 F.3d 177, 183 (4th Cir. 1998). Coworkers may be "unpleasant and sometimes cruel." <u>Hartsell v. Duplex Prods., Inc.</u>, 123 F.3d 766, 772 (4th Cir. 1997). Not every such instance renders the workplace objectively hostile. <u>See Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 751 (4th Cir.) ("[I]n prohibiting sex discrimination solely on the basis of whether the employee is a man or a woman, Title VII does not reach discrimination based on other reasons, such as the employee's sexual behavior, prudery, or vulnerability."), <u>cert. denied</u>, 519 U.S. 818 (1996). There simply is "no guarantee of refinement or sophistication in the workplace." <u>Hartsell</u>, 123 F.3d at 773. As noted above, for liability to attach, the harassing actions must be severe enough so that a reasonable person would find the environment to be hostile or abusive. <u>See Harris</u>, 510 U.S. at 21.

This Court has reviewed the facts in the light most favorable to Shaver, and finds that they do not support her claim that she was a victim of sexual harassment. This Court believes that Finley's conduct was not so severe or pervasive that it created an abusive working environment.

The alleged harassment arguably began when Finley placed his hand on Shaver's knee during her interview at Dixie. The principal basis for her sexual harassment claim, however, appears to be the two hugging incidents. These two incidents were obviously unpleasant for Shaver, but nothing suggests that they had sexual overtones. Importantly, Finley did not preface, accompany, or follow the hugs with any words or conduct containing implicit or explicit sexual references. Although Finley's conduct was inappropriate, and understandably unappreciated, this Court finds that these acts did not constitute sexual harassment under the law.

Even when viewed in a larger context that includes back rubs initiated by Finley, there is no evidence that any of Finley's comments or actions involved sexual innuendo or sexual advances. Moreover, Shaver has not shown that Finley's conduct created an environment that affected her ability to perform her job or that caused her to feel uncomfortable in the workplace. In sum, after reviewing all the facts

5

presented to this Court, we conclude that Finley's conduct did not cause a change in the terms or conditions of Shaver's employment.

Thus, summary judgment in Dixie's favor is appropriate. Accordingly, this Court also finds that there is no need to remand this case for reconsideration of Dixie's vicarious liability in light of Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998). We further find that Shaver's arguments as to her other claims are without merit.

AFFIRMED