Justice Alito,
with whom Justice Thomas joins,
concurring in the judgment.
I agree with the Court that the decision of the Court of Appeals must be reversed, but I would do so based on the statutory text, rather than principles of agency and tort law that do not speak directly to the question presented here.
The relevant statutory provision states:
“An employer shall be considered to have engaged in [prohibited discrimination against a member of one of the uniformed services] if the person’s membership . . . is a motivating factor in the employer’s action, unless the employer can prove that the action would have been taken in the absence of such membership . . . .” 38 U. S. C. § 4311(c)(1) (emphasis added).
For present purposes, the key phrase is “a motivating factor in the employer’s action.” A “motivating factor” is a factor that “providers] ... a motive.” See Webster’s Third New International Dictionary 1475 (1971) (defining “motivate”). A “motive,” in turn, is “something within a person . . . that incites him to action.” Ibid. Thus, in order for discrimination to be “a motivating factor in [an] employer’s action,” discrimination must be present “within,” i. e., in the mind of, the person who makes the decision to take that action. And “the employer’s action” here is the decision to fire petitioner. Thus, petitioner, in order to recover, was required to show that discrimination motivated that action.
The Court, however, strays from the statutory text by holding that it is enough for an employee to show that discrimination motivated some other action and that this latter action, in turn, caused the termination decision. That is simply not what the statute says.
*425 The Court fears this interpretation of the statute would allow an employer to escape liability by assigning formal de-cisionmaking authority to an officer who may merely rubber-stamp the recommendation of others who are motivated by antimilitary animus. See ante, at 420. But fidelity to the statutory text does not lead to this result. Where the officer with formal decisionmaking authority merely rubber-stamps the recommendation of others, the employer, I would hold, has actually delegated the decisionmaking responsibility to those whose recommendation is rubberstamped. I would reach a similar conclusion where the officer with the formal decisionmaking authority is put on notice that adverse information about an employee may be based on antimilitary animus but does not undertake an independent investigation of the matter. In that situation, too, the employer should be regarded as having delegated part of the decisionmaking power to those who are responsible for memorializing and transmitting the adverse information that is accepted without examination. The same cannot be said, however, where the officer with formal decisionmaking responsibility, having been alerted to the possibility that adverse information may be tainted, undertakes a reasonable investigation and finds insufficient evidence to dispute the accuracy of that information.
Nor can the employer be said to have “effectively delegated” decisionmaking authority any time a decisionmaker “relies on facts provided by [a] biased supervisor.” Ante, at 421. A decisionmaker who credits information provided by another person — for example, a judge who credits the testimony of a witness in a bench trial — does not thereby delegate a portion of the decisionmaking authority to the person who provides the information.
This interpretation of § 4311(c)(1) heeds the statutory text and would provide fair treatment for both employers and employees who are members of the uniformed services. It *426 would also encourage employers to establish internal grievance procedures similar to those that have been adopted following our decisions in Burlington Industries, Inc. v. Ellerth, 524 U. S. 742 (1998), and Faragher v. Boca Raton, 524 U. S. 775 (1998). Such procedures would often provide relief for employees without the need for litigation, and they would provide protection for employers who proceed in good faith.
The Court’s contrary approach, by contrast, is almost certain to lead to confusion and is likely to produce results that will not serve the interests of either employers or employees who are members of the uniformed services. The Court’s holding will impose liability unfairly on employers who make every effort to comply with the law, and it may have the perverse effect of discouraging employers from hiring applicants who are members of the Reserves or the National Guard. In addition, by leaving open the possibility that an employer may be held liable if it innocently takes into account adverse information provided, not by a supervisor, but by a low-level employee, see ante, at 422, n. 4, the Court increases the confusion that its decision is likely to produce.
For these reasons, I cannot accept the Court’s interpretation of § 4311(c)(1), but I nevertheless agree that the decision below must be reversed. There was sufficient evidence to support a finding that at least Korenchuk was actually delegated part of the decisionmaking authority in this case. Korenchuk was the head of the unit in which Staub worked, and it was Korenchuk who told Buck that Staub left his work area without informing his supervisors. There was evidence that Korenchuk’s accusation formed the basis of Buck’s decision to fire Staub, and that Buck simply accepted the accusation at face value. According to one version of events, Buck fired Staub immediately after Korenchuk informed her of Staub’s alleged misconduct, and she cited only that misconduct in the termination notice provided to Staub. See 5 Record 128-129, 267-268, 380-386; App. 74a. All of this is *427 enough to show that Korenchuk was in effect delegated some of Buck’s termination authority. There was also evidence from which it may be inferred that displeasure with Staub’s Reserve responsibilities was a motivating factor in Koren-chuk’s actions.*

See 5 Record 343-344 (testimony that Korenchuk made negative remarks about Staub’s Reserve duties before firing him in 1998); id., at 124-126, 352 (testimony that Korenchuk informed Staub of the revenue lost while he was on Active Duty in 2003, that Korenchuk was aware in January 2004 that Staub might be called to Active Duty again, and that “[b]udget was a big issue with [Korenchuk]”).