**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

AMY L. CURRAN,

      Plaintiff-Appellant,

v.

AMI FIREPLACE COMPANY INC.,

      Defendant-Appellee.

No. 04-1362

(D.C. No. 03-RB-673 (PAC))
(D. Colorado)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, McKAY,** and **EBEL**, Circuit Judges.

Plaintiff Amy Curran filed suit against her former employer, defendant AMI Fireplace Company (AMI), alleging hostile work environment sexual harassment in violation of Title VII. AMI moved for summary judgment. The district court struck as untimely Curran's response to AMI's motion and granted AMI's motion. Curran now appeals both of those rulings. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm in part, reverse in part, and remand for further proceedings.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

AMI, a Wisconsin corporation with offices in Aurora, Colorado, is in the business of wholesaling and installing gas fireplaces. Curran began working for AMI at its Aurora offices as a customer service representative on January 20, 1997. She left her employment with AMI after approximately six months in order to care for her ailing grandmother. Curran returned to work for AMI as a customer representative in July 2000.

When she returned to working for AMI in July 2000, Curran received a copy of an Employee Handbook produced by AMI's corporate parent, AWS/gb Corporation. Included in the handbook was a copy of the corporate parent's "Freedom From Harassment" policy, which stated as follows:

> We are committed to providing a work environment that is free of discrimination and harassment. In keeping with this commitment, we do not tolerate harassment of our employees by anyone, including any supervisor, co-worker, vendor, client, or customer of the Company.
>
> Sexual harassment deserves special attention. Unwelcome sexual advances, requests for sexual favors, and other physical, verbal, or visual conduct based on sex constitute sexual harassment when:
>
> • Submission to such conduct is made a condition of employment.
>
> • Submission to or rejection of such conduct is used as a basis for employment decisions.
>
> Such conduct unreasonably interferes with an individual's work performance or creates a hostile, intimidating, or offensive work environment.
>
> Examples of sexual harassment include, but are not limited to:

• Repeated offensive sexual flirtations, advances, or propositions.

• Innuendoes, suggestive comments, sexually oriented "kidding," jokes about gender-specific traits, or foul or obscene language or gestures.

• Displays of foul or obscene printed or visual material.

• Unwelcome and unnecessary physical contact, such as patting, pinching, or brushing against another's body.

All company employees are responsible for creating an atmosphere free of discrimination and harassment, sexual or otherwise. If you feel you have experienced or witnessed harassment, notify the Human Resources Manager immediately. If you believe it would be inappropriate to discuss the matter with the Human Resources Manager, report the problem to your supervisor or the President.

Every reported incident of employee harassment is thoroughly investigated, with respect for the confidences and sensitivities of the situation. If it is determined that sexual harassment has occurred, appropriate disciplinary action will be taken, up to and including termination.

The Company prohibits any form of retaliation against any employee for filing a bona fide complaint under this policy or for assisting in a complaint investigation.

Aplee. App. at 49-50.

Curran's job duties included overseeing the day-to-day operations of the service department. Curran was also responsible for keeping track of the whereabouts and daily activities of Glenn Payson, who was AMI's Service Manager and had direct supervision over the customer service department, including Curran's position. Payson was in the office each morning, but otherwise spent approximately eighty percent of each working day out of the office. Although Curran did not consider Payson her manager, she took orders from him on a regular basis (since, as noted, he was in charge of the customer

service department).

In August 2000, approximately one month or less after she returned to working for AMI, Payson began making sexually-related comments in front of, or directly to, Curran. Curran did not keep a journal of the comments, nor does she remember specific dates of when comments were made. She does, however, remember the specifics of several of the comments. First, Curran recalls Payson standing beside her desk, looking directly at her, and having a conversation with another man across the office "about having sex with a sheep and saying, Wouldn't that be great?" Aplee. App. at 24. Second, Curran recalls Payson making "lots of comments . . . about [her] breasts," including saying "that they [her breasts] were bigger than the last time that [she] worked" for AMI, and that he would like to lay his head on her breasts and have her comfort him. Id. Third, Curran recalls coming to work one day with boots on, and Payson "kind of whistling at [her] and . . . saying how good [her] boots looked," and calling them "CFM boots." Id. When Curran looked at Payson "like [she] didn't know what he was talking about," he laughed and said they were "Come-fuck-me boots and said that he would do [her]." Id.

According to Curran, she complained about Payson's comments, beginning in August 2000, to both Terry Manzanares, AMI's Office Manager, and AMI's General Manager, Bruce Brown.[1] App., Doc. 2 at 5; Aplee. App. at 25. Brown allegedly assured Curran on each such occasion that he would "take care of it." Aplee. App. at 25. Brown,

---

[1] Manzanares disputes this assertion and contends the first time Curran complained about Payson's conduct was in October 2000. Aplee. App. at 37.

in turn, verbally reprimanded Payson for his conduct, either by telephone or in person. It is disputed how many times Brown reprimanded Payson. AMI contends there were only two such reprimands. Curran alleges there were at least three.

Each time that Curran would complain and Brown would reprimand Payson, Payson would refrain for approximately a week to ten days from making sexually-related comments to Curran. Payson would, however, "walk around and be mad at [Curran]," accusing her "of not performing," threatening to write her up, and sometimes clocking her out when she was, in fact, at work. Aplee. App. at 25, 33. And, ultimately, Payson would begin making inappropriate comments to Curran again.[2]

On January 16, 2001, Tammy Weaver, one of Curran's co-workers, sent an anonymous letter to AMI's corporate headquarters in Wisconsin complaining about Payson. Weaver's anonymous letter prompted an investigation which resulted in Payson's termination from employment with AMI on January 24, 2001.[3]

Curran took a medical leave of absence in late January 2001, shortly after Payson was terminated from his employment. When Curran returned to work in the spring of 2001, Manzanares allegedly accused her "getting [Payson] fired." Aplee. App. at 71.

---

[2] There is some evidence in the record suggesting that Brown and Manzanares were friends with Brown, and, as a result, were reluctant to do anything other than verbally reprimand him.

[3] Although AMI is a Wisconsin corporation, there is no indication in the record that it has offices other than in Colorado. Further, the record does not include a copy of Weaver's letter, nor does it specify who Weaver's letter was addressed to. Thus, it is unclear whether AMI employees, or employees of AMI's corporate parent, AWS/gb Corporation, conducted the investigation and terminated Payson's employment.

Curran subsequently resigned in May 2001.[4]

Curran filed this suit against AMI on April 15, 2003, asserting claims under Title VII for sexual harassment and retaliation, as well as negligent supervision under state law. On January 14, 2004, AMI moved for summary judgment on all of Curran's claims. Curran moved to strike AMI's brief in support of its motion for summary judgment, arguing that it failed to "set out . . . the burden of proof, elements, undisputed facts, and required facts in the clear and direct manner required by" the local rules. App., Doc. 3, at 2. On April 13, 2004, the district court denied Curran's motion to strike, concluding that AMI's failure to precisely follow the local rules was "not a significant impediment to the resolution of the motion." Id., Doc. 4. The district court further directed Curran to file her response to AMI's motion "on or before April 23, 2004." Id. On April 22, 2004, Curran filed a motion for extension of time, asking the district to allow her until May 7, 2004, to file her response to AMI's motion. The district court denied Curran's motion one day later, on April 23, 2004. On April 30, 2004, Curran filed a motion for extension of time, asking the district court to allow her until May 14, 2004, to file her response to

---

[4] In February 2001, prior to resigning from AMI, Curran filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). App., Doc. 2 at 6. The EEOC investigated and issued a written "Determination" concluding that AMI "did not take immediate and corrective action, that despite their knowledge of the service manager's conduct, he was allowed to make sexual comments and innuendoes that created a hostile work environment." Id., Exhibit B, at 1. The EEOC further found that Payson "would go into [Curran's] office on a daily basis and make sexually explicit comments about his sex life and comments about [Curran's] and other females' body parts." Id. This evidence, however, was submitted to the district court by Curran in connection with her response to AMI's motion for summary judgment and, as explained below, was ultimately stricken by the district court.

AMI's motion. The district court, over AMI's objection, granted Curran's request in part, but stated that her "response shall be filed by 5:00 p.m., Monday, May 10, 2004." Id., Doc. 7, at 1. Curran filed her response to AMI's motion for summary judgment on May 13, 2004. On May 17, 2004, AMI moved to strike Curran's response, arguing that it was untimely. On September 8, 2004, the district court issued a written order granting AMI's motion to strike Curran's response, and granting AMI's motion for summary judgment in its entirety.

II.

*Striking of Curran's response to AMI's summary judgment motion*

In her first issue on appeal, Curran contends the district court failed to properly apply Federal Rule of Civil Procedure 6(e) and in turn erred in striking as untimely her response to AMI's motion for summary judgment. Generally speaking, we review for abuse of discretion a district court's decision to strike as untimely a party's pleading. In re Young, 91 F.3d 1367, 1377 (10th Cir. 1996). To the extent, however, that Curran's arguments hinge on the interpretation of Rule 6(e), we review them de novo. See Garcia-Martinez v. City and County of Denver, 392 F.3d 1187, 1190 (10th Cir. 2004).

Rule 6(e), entitled "Additional Time After Service under Rule 5(b)(2)(B), (C), or (D)," provides as follows:

> Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party under Rule 5(b)(2)(B), (C), or (D), 3 days shall be added to the prescribed period.

Fed. R. Civ. P. 6(e). Curran contends Rule 6(e) was triggered in her case because the district court's May 3, 2004, minute order granting her motion for extension of time was mailed to her attorney. Thus, Curran contends, Rule 6(e) authorized her to add three days to the May 10, 2004, deadline set forth in the district court's minute order.

We disagree. The phrase "prescribed period," as used in Rule 6(e), clearly refers to periods of time to be computed under Rule 6(a), i.e., "any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute . . . ." Fed. R. Civ. P. 6(a). Here, there was no "period of time" prescribed in the district court's minute order (such as "ten days"). Rather, the district court's minute order set forth a specific date and time by which Curran had to file her response to AMI's motion for summary judgment. In other words, Curran and her counsel were not required to compute the period of time in which she had to file her response; instead, they were given a specific and firm deadline by the district court. Thus, neither Rule 6(a) nor 6(e) were triggered by the district court's order. See <u>Faust v. Anderson</u>, 52 F.Supp.2d 930, 934-35 (N.D. Ind. 1999) (concluding that when court specifies a filing deadline, the parties' papers must reach clerk's office by that deadline date, and that Rule 6(e) is inapplicable).

Because the district court properly concluded that Curran's response to AMI's summary judgment motion was untimely, we conclude the district court in turn acted well within its discretion in striking that response.

*Grant of summary judgment - hostile work environment sexual harassment*

Curran contends that, even if the district properly struck her response, it otherwise erred in granting summary judgment in favor of AMI on her claim of hostile work environment sexual harassment under Title VII.[5] We review a district court's grant of summary judgment de novo. Stanko v. Maher, 419 F.3d 1107, 1111 (10th Cir. 2005). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Id. at 1111-12. "In determining whether the evidence presents a genuine issue of material fact, we view it in the light most favorable to the party against whom summary judgment was entered." Id. at 1112.

"Title VII prohibits an employer from 'discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'" Medina v. Income Support Div., 413 F.3d 1131, 1134 (10th Cir. 2005) (quoting 42 U.S.C. § 2000e-2(a)(1)). "To establish the existence of a hostile work environment actionable under Title VII, a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." Id. at 1134.

---

[5] The district court also granted summary judgment in favor of AMI on Curran's claim of retaliation under Title VII, and her state law claim of negligent supervision. Curran has not, however, challenged these rulings on appeal.

Employers are not automatically liable for hostile work environment sexual harassment perpetrated by their employees. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998). If the perpetrator of the hostile work environment sexual harassment is a non-supervisory co-worker, an employer's vicarious liability depends on the plaintiff showing that the employer knew or reasonably should have known about the harassment but failed to take appropriate remedial action. See Faragher, 524 U.S. at 789. If the perpetrator of the hostile work environment sexual harassment is a supervisor with immediate or successively higher authority over the plaintiff, a plaintiff can establish vicarious liability on the part of the employer in one of two ways. First, a plaintiff can demonstrate that the supervisor's behavior "culminate[d] in a tangible employment action" against the plaintiff (e.g., discharge, demotion, or undesirable reassignment). Ellerth, 524 U.S. at 765. Under such circumstances, the employer is vicariously liable for the supervisor's behavior, and no affirmative defense is available. Id. at 762-63, 765. Second, even absent a tangible employment action, an employer will still be liable for a hostile work environment created by one of its supervisory employees unless it proves, by a preponderance of the evidence, a two-pronged affirmative defense: (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765; accord Faragher, 524 U.S. at 807.

*a) District court's ruling*

In granting summary judgment in favor of AMI, the district court first concluded that "[n]o reasonable jury could find that [Curran] was subjected to an objectively hostile work environment . . . ." Aplee. App. at 4. In reaching this conclusion, the district court stated that Curran "could recall only three specific remarks directed at her" and that, while "[t]hose comments unquestionably were boorish, crude, and inappropriate," they were "not sufficient to state a claim for hostile work environment sexual harassment." Id. The district court also concluded that, "[e]ven assuming arguendo that plaintiff could establish an objectively hostile working environment," AMI had established an affirmative defense to liability for that harassment. Id. In particular, the district court concluded "the evidence show[ed] that defendant took prompt, adequate, and effective remedial action to address the harassment," id., and that Curran "did not follow the complaint procedure outlined" in AMI's anti-harassment policy, which stated that complaints of harassment should be directed to AMI's Human Resources Manager. Id. at 5.

*b) Payson's status: co-worker or supervisor?*

Although the parties do not discuss it in great detail, we conclude the evidence contained in the record on appeal is sufficient to create a genuine issue of material fact concerning whether Payson had direct, supervisory authority over Curran. AMI has presented deposition testimony from Curran indicating that she considered Manzanares and Brown to be her managers. However, a careful review of the submitted excerpts of

Curran's deposition also indicate that Payson was in charge of the customer service department, which included Curran's position as customer service representative, and that Curran considered herself, in effect, Payson's assistant. Further, the evidence indicates that Payson had authority, granted to him by AMI, to give orders to Curran and, if necessary, to "write her up" for poor performance. Thus, we conclude a jury considering this evidence could reasonably conclude that Payson did, in fact, have direct, supervisory authority over Curran.

*c) Was Curran subjected to hostile work environment harassment?*

"[I]n order to be actionable under" Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787. "[T]o determine whether an environment is sufficiently hostile or abusive," a finder of fact must look at all the relevant circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 787-88 (internal quotation marks omitted). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. at 788 (internal quotation marks omitted).

Here, the evidence in the record firmly establishes that Curran subjectively perceived Payson's comments as creating a hostile or abusive working environment. Not

only did Curran testify in her deposition that she found Payson's conduct offensive and abusive, the evidence in the record indicates that she took a leave of absence from her position in January 2001 due to emotional problems allegedly arising out of Payson's harassment of her. Thus, the critical question in deciding if AMI was entitled to summary judgment is whether, from an objective point of view, Payson's alleged conduct was so severe or pervasive that it would have created an abusive working environment for Curran.

Although the district court concluded that the evidence established only three separate incidents of derogatory remarks made by Payson to Curran, a careful examination of Curran's deposition testimony and the other evidentiary materials contained in the record on appeal (excluding any evidence submitted by Curran in connection with her response to AMI's motion) would have allowed a jury to reasonably find that Curran was repeatedly subjected to sexually-related remarks by Payson from August 2000 through January 2001. For example, Curran testified that, from shortly after the time she returned to work for AMI in the summer of 2000 until January 2001, Payson repeatedly made comments about her breasts. The fact that she remembered the precise nature of only two of those remarks does not undercut her sworn testimony that Payson made other, similar remarks over the course of approximately five to six months. Further, although Payson's comments were not physically threatening, they undoubtedly were humiliating, since they concerned Curran's physical attributes and clothing. Although AMI points to the uncontroverted fact that Payson spent approximately eighty percent of

each working day outside of the office, the uncontroverted evidence also establishes that (a) he was physically present in AMI's office each day and, during that time, would make the offensive comments to Curran, (b) communicated directly with Curran throughout each day, even when he was out of the office, (c) had direct supervisory authority over Curran, and (d) attempted to exercise that supervisory authority in a negative manner on the few occasions when he was reprimanded by Brown for his comments to Curran (e.g., by threatening to "write-up" Curran and by clocking her out when she was, in fact, at work).

In sum, we conclude the evidence in the record, considered as a whole, was sufficient to create a genuine issue of material fact concerning whether Curran was subjected to an actionable, sexually objectionable working environment. Thus, the district court erred in concluding otherwise.

*d) Did AMI present sufficient evidence to establish the available affirmative defense?*

As noted, an employer can avoid vicarious liability for sexual harassment committed by one of its supervisors against a subordinate, assuming the harassment did not culminate in a tangible employment action, if the employer proves (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765. Here, the district court concluded that AMI had presented sufficient

-14-

evidence to entitle it to summary judgment on this affirmative defense. More specifically, the district court concluded that, even if Curran could establish an objectively hostile working environment, AMI had produced evidence demonstrating that it "took prompt, adequate, and effective remedial action to address the harassment," Aplee. App. at 4, and that Curran "did not follow the complaint procedure outlined" in AMI's anti-harassment policy, which stated that complaints of harassment should be directed to AMI's Human Resources Manager. Id. at 5.

Our review of the record on appeal, however, leads us to conclude that genuine issues of material fact exist concerning whether AMI exercised reasonable care to correct promptly the harassment complained of by Curran. The evidence in the record on appeal establishes that, at an absolute minimum, Curran approached Manzanares and Brown at least three times and complained about the comments Payson was making to her. Aplee. App. at 25. Indeed, construing the evidence in the light most favorable to Curran, a jury could reasonably find that she repeatedly complained about Payson to Manzanares and Brown, beginning shortly after she returned to employment with AMI in the summer of 2000. See id. at 24 ("Yeah, there were lots of comments that I told Terry [Manzanares] and Bruce [Brown] both about."), 25 ("From the time the comments started in August, I told Terry and Bruce."). Each time Curran complained, Manzanares and Brown assured her they "would take care of it" by speaking with Payson, and in turn there would be a temporary change in Payson's behavior towards her. Id. In particular, Payson would, for approximately a week to ten days after being admonished, refrain from making sexually-

offensive comments towards her.  Id.  At the same time, however, "[h]e would accuse [her] of not performing," id., and would threaten to write her up.  Id. at 26.  On each such occasion, Payson would eventually resume making sexually-offensive remarks towards Curran.  Lastly, the record establishes that Payson's harassing conduct did not completely stop until another AMI employee, Tammy Weaver, sent an anonymous letter to the headquarters of AMI's corporate parent, leading to an investigation by the corporate parent of Payson's conduct and Payson's termination from employment with AMI. Considering this evidence together, we conclude a reasonable jury could find that AMI, through its managers Brown and Manzanares, did not take prompt and adequate steps to remedy Payson's behavior.  Thus, we conclude the district court erred in granting summary judgment in favor of AMI on the basis of the affirmative defense.[6]

We AFFIRM the district court's order striking as untimely Curran's response to AMI's motion for summary judgment, REVERSE the district court's grant of summary judgment in favor of AMI on Curran's claim of hostile work environment sexual

---

[6] Having concluded that genuine issues of material fact exist concerning the first prong of the affirmative defense, we find it unnecessary to address the second prong of that defense, i.e., whether Curran, by failing to contact AMI's Human Resources Department, reasonably failed to take advantage of any preventive or corrective opportunities provided by AMI.

harassment, and REMAND the case to the district court for further proceedings.[7]

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[7] On remand, Curran may reassert whatever arguments and evidence she proposed in her untimely response to AMI's summary judgment motion. Our affirmance of the district court's ruling granting AMI's motion to strike is relevant only to the summary judgment proceedings and our review of them. This ruling does not limit Curran's arguments and evidence on remand.