KING, Justice, for the Court:
¶ 1. Pursuant to 42 United States Code Sections 2000e-5 and 1983, Shirley Johnson brought suit against the City of Belzo-ni; Mickey Foxworth, individually and in his capacity as City of Belzoni Police Chief; and David James, City of Belzoni police officer. Johnson claimed she was sexually harassed at work by James for approximately a year. Johnson reported the harassment to her supervisor, Fox-worth, but claimed insufficient action was taken to remedy the situation. This matter proceeded to trial, and the jury returned a unanimous verdict of $150,000-$50,000 against each of the defendants, in favor of Johnson. Aggrieved, the defendants filed a motion for judgment notwithstanding the verdict, or in the alternative, a new trial. The motion was denied and the defendants appealed. Finding that the sufficiency and weight of the evidence sup *102 port the jury’s verdict, we affirm the judgment of the trial court.
FACTS AND PROCEDURAL HISTORY
¶ 2. On July 7, 2004, Johnson was hired by the City of Belzoni Police Department as a patrol officer policing school grounds. When she joined the police department, she was the only female police officer on the force. She remained the only female on the force for approximately six months. Johnson claims that, once she began work, James began to sexually harass her. Pursuant to the City of Belzoni Police Department Policy on “Harassment in the Workplace,” Johnson reported the harassment to her supervisor, Foxworth. Johnson and Foxworth also reported the situation to Mayor Wardell Walton, who, as mayor, is responsible for the enforcement of all city policies. In August 2005, Johnson accepted a full-time management position at Double Quick in Belzoni,[1] but she continued to work for the Belzoni Police Department on a part-time basis.
¶ 3. On September 21, 2005, Johnson filed her charge of discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC conducted an investigation and issued a determination letter, stating:
The investigation showed that [Johnson] was subjected to sexual harassment by a co-worker and that she lodged two complaints to the proper authority. The [City of Belzoni-Police Department] failed to take the complaints seriously or take positive action necessary to put the co-worker’s inappropriate behavior in check and ensure that further harassment would not occur.
¶ 4. On June 19, 2006, the EEOC issued a right-to-sue letter, and on September 15, 2006, Johnson filed suit in the Humphrey’s County Circuit Court claiming that she had been subjected to gender discrimination, including sexual harassment, in her workplace in violation of 42 United States Code Sections 2000e-5 and 1988. On April 27, 2010, the defendants filed a motion for summary judgment. On June 14, 2010, the court denied the motion and on June 16, 2010, the matter proceeded to trial. Johnson was the first witness to testify. According to Johnson, James repeatedly had asked her for a date when she began working for the police department. Johnson testified that after she refused to date James, he had directed profanity and sexual innuendos at her. Specifically, Johnson testified that James said, “I didn’t want a date no way. I just want to [expletive[2]] you.” Johnson testified that she reported the harassment to Foxworth, and he agreed to talk to James regarding his behavior.
¶ 5. Johnson testified that the harassment continued, and James made comments nearly every day at work and, usually, in front of other officers. Johnson testified that she usually would encounter James before the beginning of her shift, upon her arrival at the station to clock in, before reporting to her assigned school. According to Johnson, “[E]ach morning that I would go to work, he had some type of remark that he had to say, talking about me under my clothes and how he wanted to [expletive] me and how Jesus told him he was going to get this and all of that, while the other guys sit out there and laugh.” Johnson testified that, approximately two months after she first reported *103 James’s behavior to Foxworth, she reported the continued harassment to Foxworth.
¶ 6. When the school year ended in May, Johnson testified that her schedule changed, and she worked different, rotating, patrol shifts. Johnson testified that, once she began working the different shifts, James had made comments directly related to her work as a police officer. Johnson specifically indicated that, on one occasion, James had refused to contact Johnson for back-up support, and instead had contacted the sheriffs department because he “needed manpower, and not female power.” Johnson testified that she reported the incident to Foxworth, her third complaint against James.
¶ 7. Johnson testified that the harassment was an ongoing issue. According to Johnson, she reported the harassment to Mayor Walton as well. Johnson testified that, on two separate occasions, she informed Mayor Walton that she was not treated fairly at the police department because she was female. According to Johnson, Foxworth was present during one of those occasions. Johnson testified that she informed Mayor Walton of unfair practices in the scheduling of officers and of the harassment she had suffered.
¶ 8. Johnson indicated that she was unaware of any action Foxworth or Mayor Walton took in response to her reports. Johnson testified that James’s behavior offended and humiliated her and caused her to suffer chest pains and headaches, making it difficult to sleep. According to Johnson, she decided to take a management position at Double Quick to escape the work environment at the police department. Johnson said:
By his statements and the way David James treated me, it made me feel as if I was just a piece of meat, when I go to work, I felt like I might have been two feet tall. I just felt I couldn’t do my job anymore — seems like he just took everything away from me.... I mean my confidence, my self respect.... [I]t’s just hard to work there. And I don’t know if he had my back when I was working on a shift with him or not. I don’t know if they really have my back.... Because there have been times I called for back-up, I don’t get any.
¶ 9. Johnson testified that she continued to work part-time for the police department, but only on certain days, to avoid working with James. Even working part-time, Johnson testified that the harassment continued. Johnson explained that in August 2005, she and James had an altercation over badge numbers. According to Johnson, badge numbers could signify seniority, and Foxworth had recently changed the officers’ badge numbers. Due to the change, Johnson’s badge number reflected seniority over James. Johnson testified that James became angry and began shouting at her. According to Johnson, she responded that the number was insignificant and James said, “[Expletive [3]], you going to watch how you talk to me.” Johnson testified that she understood his comment to be derogatory to her as a female, “by me being a female, he thought I wasn’t no police and I couldn’t do nothing.”
¶ 10. Foxworth testified and corroborated that Johnson had reported James for harassment, but only on two occasions. Foxworth testified that when Johnson first reported the harassment to him, she did not want any disciplinary action taken. According to Foxworth, Johnson asked him to talk to James regarding his behavior. Foxworth testified that he met with James, who denied the allegations. As for *104 Johnson’s second report of harassment, Foxworth testified that he followed procedure.
¶ 11. According to the “Harassment in the Workplace” policy of the Belzoni Police Department, each supervisor has certain responsibilities regarding the prevention of harassment. The responsibilities include: monitoring the unit work environment on a daily basis for signs that harassment may be occurring, counseling all employees on the types of behavior prohibited and the department procedures for reporting complaints of harassment, stopping any observed acts that may be considered harassment, and taking immediate action to limit the work contact between two employees when there has been a complaint of harassment, pending investigation. Furthermore, according to the policy, once a supervisor is informed of harassment in the workplace, the supervisor is responsible for assisting the employee in documenting a formal complaint, investigating the complaint and preventing future harassment.
¶ 12. Foxworth testified that he had investigated the accusation by speaking with other officers and patrolling when both officers were working, and in doing so, found no proof that the harassment had occurred. Foxworth stated that sexual harassment was discussed at periodic meetings at the station, but he also acknowledged that many of his officers did not like to work with female officers. In an attempt to resolve the situation, Fox-worth testified that he had placed James and Johnson on different shifts so they would work together less frequently. Fox-worth explained that he could not keep them completely separated because of the size of the police department. Foxworth admitted that no formal complaint was documented.
¶ 13. Mayor Walton testified that Johnson had informed him that she was not being treated equally or fairly while at work for the police department. According to Mayor Walton, Johnson first approached him regarding the situation directly after the election, and he explained to her that he would follow up with her. Mayor Walton testified that Johnson later had returned with Foxworth and had explained that she was being treated unfairly at work. Mayor Walton testified that he had instructed Foxworth to investigate the situation. Mayor Walton testified that, because of the results of Foxworth’s investigation, no action was taken by the City of Belzoni.
¶ 14. James testified that he never had asked Johnson on a date or harassed her in any way. James explained that he had a girlfriend during the time the alleged events took place. James testified that he and Johnson were friends, and that he had attended parties and cook-outs at Johnson’s home before and after Johnson had made the allegations. James stated that he “treated her like one of the guys.” According to James, when Foxworth had confronted him about the harassment allegations, he had denied that any harassment had ever occurred. Even so, James testified that he and Johnson were both written up and then scheduled for different shifts because of the allegations. According to James, he and Johnson had maintained their friendship after the meeting with Foxworth.
¶ 15. James also testified that, once Johnson was working part-time, he and Johnson had argued over their badge numbers and seniority. According to James, Johnson had overheard James speaking to another officer regarding the change in badge numbers; Johnson had became aggravated and had started yelling obscenities at him; and James had responded by *105 yelling obscenities at her. James testified that they were both written up for the incident.
¶ 16. Fellow officers Truron Grayson, Ronnie Buchanan, Lester Jones, and Loto-sha Seals also testified. The officers admitted that there were occasions when graphic language was used in conversation and innuendos were used pertaining to sexual activity. Each of the officers testified that Johnson was a participant in the conversations, and that she had never seemed offended. The officers testified that they were unaware of any problem between Johnson and James. Jones testified that he thought Johnson and James were friends because Johnson would invite Jones and James to dinner on a regular basis.
¶ 17. Only Officer Seals agreed with Johnson’s claim of gender discrimination within the police department. Officer Seals testified that “the female officers were, in fact, treated differently than the male officers.” Officer Seals explained that the male police officers were given patrol cars and provided with bullet-proof vests, while the female officers were not. Officer Seals stated that discrimination existed, but it was not sexual in nature, and it was reported to Foxworth.
¶ 18. The jury returned a $150,000 verdict in favor of Johnson. On June 28, 2010, the defendants filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. On November 3, 2010, the defendants’ motion was denied, and defendants then filed their notice of appeal.
DISCUSSION
¶ 19. The defendants raise the following issues on appeal: (1) whether the trial court erred in denying their motion for summary judgment; (2) whether the trial court erred in allowing Johnson to maintain a Title YII action against both the City of Belzoni and its agents for the same cause of action; (3) whether the trial court erred in failing to dismiss Foxworth and James from the Section 1983 claim; (4) whether Johnson proved she was subjected to a hostile or abusive work environment; (5) whether the exclusive remedy of this cause of action is provided by the Mississippi Tort Claims Act; (6) whether the jury abandoned its oath when it returned a $150,000 verdict for Johnson; and (7) whether the trial court erred in denying the defendants’ motion for judgment notwithstanding the verdict, or in the alternative, for a new trial.
1. Motion for Summary Judgment
¶ 20. This Court reviews a trial court’s grant or denial of summary judgment de novo. One South, Inc. v. Hollowell, 963 So.2d 1156, 1160 (Miss.2007). Summary judgment should be rendered when “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Miss. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists, whereas the nonmoving party is given the benefit of the doubt as to the existence of a material fact. Monsanto Co. v. Hall, 912 So.2d 134, 136 (Miss.2005). When considering a motion for summary judgment, evidence must be viewed in the light most favorable to the nonmoving party. Price v. Purdue Pharma Co., 920 So.2d 479, 483 (Miss.2006).
¶ 21. The defendants argue that the trial court erred in failing to grant their motion for summary judgment. Within the motion for summary judgment, the defendants argued that Johnson was not *106 entitled to maintain a Title VII action (42 U.S.C. § 2000e-5) against both the City and its employees and that Johnson could not prove her work environment was hostile. As for the Title VII claim, Johnson’s counsel clearly stated, both during pretrial motions and at trial, that Johnson was pursuing a Title VII claim against only the City of Belzoni. Thus, this issue is without merit, as it is moot.
¶ 22. As for Johnson’s claim of a hostile work environment, the trial court was presented with conflicting testimony. Because “[a] motion for summary judgment is not a substitute for trial of disputed fact issues,” the trial court was correct to deny the defendants’ motion for summary judgment. Owens Corning v. R.J. Reynolds Tobacco Co., 868 So.2d 331, 335 (Miss.2004). There was no error in denying the defendants’ motion for summary judgment.
2. Title VII
¶ 23. The defendants argue that the trial court erred in allowing Johnson to maintain a Title VII action against both the City of Belzoni and the individual defendants, Foxworth and James. Johnson’s counsel clearly stated, both during pretrial motions and trial, that Johnson was pursuing a Title VII claim against only the City of Belzoni. In Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 759, 118 S.Ct. 2257, 2273, 141 L.Ed.2d 633 (1998), the United States Supreme Court established that an employer is liable under Title VII for coworker harassment under a negligence theory if the employer knew, or should have known, and failed to take prompt or remedial action.
¶ 24. Johnson’s intentions regarding her Title VII claim were clearly articulated. The instruction to the jury was clear that Johnson was asserting a Title VII claim against only the City of Belzoni, and stated:
[T]he employer becomes liable if it becomes aware of the harassment but fails to take prompt remedial action to stop the harassment.
Therefore, in order for Shirley Johnson to prevail on her claim against the City of Belzoni, she must prove all of the following elements of her claim by a preponderance of the evidence:
1. That she was subjected to harassment in the workplace and that the harassment was based on her gender (female);
2. That the harassment was sufficiently pervasive or severe to create an abusive work environment; and
3. That the City of Belzoni was aware of the harassment but failed to take prompt remedial action to stop it.
¶ 25. According to the “Harassment in the Workplace” policy of the Belzoni Police Department, each supervisor has certain responsibilities regarding the prevention of harassment. The responsibilities include: monitoring the unit work environment on a daily basis for signs that harassment may be occurring, counseling all employees on the types of behavior prohibited and the department procedures for reporting complaints of harassment, stopping any observed acts that may be considered harassment, and taking immediate action to limit the work contact between two employees when there has been a complaint of harassment, pending investigation. According to the policy, once a supervisor is informed of harassment in the workplace, the supervisor is responsible for assisting the employee in documenting a formal complaint, investigating the complaint and preventing future harassment.
¶ 26. Johnson argues that Foxworth and Mayor Walton failed to take any action to resolve the situation. Johnson did *107 not pursue a Title VII claim against James or Foxworth individually. Instead, her claim was against the City of Belzoni under a negligence theory, as permitted by the United States Supreme Court. This issue is without merit.
3. Section 1983
¶ 27. The defendants argue that the trial court erred in allowing Johnson to maintain a Section 1983 against Foxworth and James. Section 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
42 U.S.C. § 1983 (Rev. 2009).
¶ 28. Section 1983 encompasses both official-capacity and personal-liability actions against state officials. The United States Supreme Court previously has held that:
[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a “ ‘moving force’ ” behind the deprivation; thus, in an official-capacity suit the entity’s “policy or custom” must have played a part in the violation of federal law.
Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (citations omitted).
¶ 29. The defendants suggest that, because neither Foxworth nor James is a policymaker, the necessary elements to maintain a Section 1983 action against either of them in their official capacities do not exist. The record, including the complaint and the trial transcript, specify that Johnson named Fox worth and James as defendants in their individual capacities in order to hold them responsible for their own actions. Johnson claimed that James continually harassed her and Foxworth failed to remedy the situation. Pursuant to Kentucky v. Graham, this Court previously has recognized that state officials can be subject to personal liability in Section 1983 actions. East Miss. State Hosp. v. Callens, 892 So.2d 800, 809, 810-811 (¶¶ 15-19) (Miss.2005). This issue is without merit.
4. Hostile Work Environment
¶ 30. The defendants argue that Johnson did not establish the existence of a hostile work environment, which is a necessary element of a Title VII claim. Title VII makes it unlawful “for an employer ... to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual’s race, col- or, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(l). The phrase “terms, conditions or privileges of employment” has been interpreted to provide a cause of action to a person who works in a discriminatorily hostile environment. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 20, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).
¶ 31. The United States Supreme Court provided the standard to be applied to determine whether an environment is hostile:
Whether an environment is “hostile” or “abusive” can be determined only by *108 looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance. The effect on the employee’s psychological well-being is relevant in determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.
Id. at 23.
¶ 32. In the instant case, Johnson described the conduct of James as outrageous, indecent and abusive. According to Johnson, James insulted her ability as a police officer because of her gender and made her the target of unwanted sexual innuendos and vulgar comments. Johnson testified that the behavior had continued for nearly a year on a daily basis. Johnson testified that she had reported the incident to Foxworth, who corroborated her testimony of reporting the harassment, and that she felt no action had been taken in regard to the complaints. Johnson testified that, as a result of James’s behavior, she had suffered from physical and emotional injuries and felt as if she could no longer perform her occupational duties.
¶ 33. Under the principles announced in Hams, there was sufficient evidence to indicate a hostile working environment caused by James’s behavior, as well as the corresponding failure of Foxworth and the City of Belzoni to rectify the situation. This issue is without merit.
5. Mississippi Tort Claims Act
¶ 34. The defendants argue that Johnson’s federal claims are barred by the procedural requirements of the Mississippi Tort Claims Act, including providing appropriate notice. This Court has already determined that the Mississippi Tort Claims Act does not apply to a Section 1983 claim. McGehee v. DePoyster, 708 So.2d 77, 80 (Miss.1998). In McGehee, this Court relied on the United States Supreme Court’s decision in Felder v. Casey, 487 U.S. 131, 140-41, 108 S.Ct. 2302, 2307-08, 101 L.Ed.2d 123, 139-40 (1988), specifically holding that state notice-of-claim requirements are not applicable to Section 1983 actions brought in state courts.
¶ 35. In Felder, the court held:
[The States’s] authority does not extend so far as to permit States to place conditions on the vindication of a federal right. Congress meant to provide individuals immediate access to the federal courts and did not contemplate that those who sought to vindicate their federal rights in state courts could be required to seek redress in the first instance from the very state officials whose hostility to those rights precipitated their injuries.

Id.

¶ 36. The same principles announced in Felder and McGehee are applicable in regard to the Title VII claim. As previously stated, the Mississippi Legislature has no authority to place a condition on the vindication of a federal right. “The decision to subject state subdivisions to liability for violations of federal rights, however, was a choice that Congress made, and it is a decision that the State has no authority to override.” Id.
¶ 37. For the above-mentioned reasons, the notice requirements of the Mississippi Tort Claims Act are not applicable to a Title VII or Section 1983 claim. This issue is without merit.
6. Jury Verdict
¶ 38. The defendants argue that the jury abandoned its oath when it re *109 turned a $150,000 verdict in favor of Johnson. During trial, the jury was instructed to award damages only for emotional pain, suffering, inconvenience, and mental anguish. Both Title VII and Section 1983 provide the right to recover compensatory damages for emotional distress. See 42 U.S.C. § 1981a (Rev. 2009).
¶ 39. The defendants claim that the amount awarded by the jury was not supported by evidence. It is true that compensatory damages for emotional distress may be awarded only when specific evidence of actual harm is introduced. See Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 808 (5th Cir.1996) (citing Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). However, testimony of the plaintiff alone may be enough to satisfy this requirement. See Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1046 (5th Cir.1998); Forsyth v. City of Dallas, 91 F.3d 769, 774 (5th Cir.1996).
¶ 40. In the instant case, Johnson testified that James’s behavior had affected her confidence, self respect, and dignity. Johnson testified that James’s behavior had offended and humiliated her. According to Johnson, she no longer wanted to be attractive to anyone. Johnson explained that she cut her hair very short so that no one would find her attractive. She testified that, “Physically, I started suffering with chest pains and headaches, unable to sleep.” According to Johnson, she decided to take a management position at Double Quick in order to escape the work environment at the police department. Thus, there was sufficient evidence to support the jury’s award. This issue is without merit.
7. Motion for Judgment Notwithstanding the Verdict or New Trial

JNOV

¶ 41. The defendants argue that the trial court erred in denying their motion for judgment notwithstanding the verdict or in the alternative, a new trial. We will affirm the denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict if there is substantial evidence to support the verdict. U.S. Fid. & Guar. Co. v. Martin, 998 So.2d 956, 964 (Miss.2008).
¶ 42. Johnson testified that James had used vulgar, profane language and sexual innuendos towards her. According to Johnson, she had reported the situation to Foxworth on three separate occasions. Foxworth testified and corroborated that Johnson had, in fact, reported being harassed. Mayor Walton also testified and stated that Johnson had reported being treated unfairly.
¶ 43. A fellow officer, Seals, testified that discrepancies had occurred in the treatment of female officers within the police department. According to Seals, she also had reported differential treatment between the sexes to Foxworth.
¶ 44. The determination letter from the EEOC, which stated that the EEOC had investigated the charge and had granted Johnson the right to sue, was entered into evidence. The record holds sufficient evidence to support the jury’s verdict.

New Trial

¶ 45. As for the motion for a new trial, this Court “will only reverse the denial of a motion for a new trial when the trial court has abused its discretion.” Davis v. Wal-Mart Stores, Inc., 724 So.2d 907, 910 (¶ 11) (Miss.1998) (citation omitted). “A motion for a new trial may be granted in several circumstances including where faulty jury instructions have been given, where the verdict is against the overwhelming weight of the evidence, or where bias, passion, or prejudice have *110 tainted the jury’s verdict.” Id. (citations omitted).
¶ 46. Both versions of events were presented to the jury; Johnson testified as to her alleged harassment, and the defense presented testimony of witnesses who denied any form of harassment. Thus, the case presented a question of witness credibility, which is for the jury alone. In reviewing the weight of the evidence supporting a verdict, this Court will not “pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief.” Massey v. State, 992 So.2d 1161, 1163 (¶ 12) (Miss.2008).
¶ 47. We find that trial court did not err in denying the defendants’ motion for judgment notwithstanding the verdict or in the alternative, a new trial. This issue is without merit.
CONCLUSION
¶ 48. Based on this discussion, the judgment of the trial court is affirmed.
¶ 49. AFFIRMED.
WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. In December 2005, based on the company's employment needs, Johnson relocated with her management position to the Double Quick in Yazoo City.

. Slang expression for his desire for sexual intercourse.

. Derogatory term for a female.